UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SAMANTHA GOOD and DARREN LUMBARD,

                    Plaintiffs,

v.                                                      1:19-CV-0683
                                                        (GTS/CFH)
PEAK RESORTS, INC. and HUNTER MOUNTAIN
SKI BOWL, INC.,

                    Defendants.
_____

APPEARANCES:                                OF COUNSEL:

PRONER & PRONER                             MITCHELL L. PRONER, ESQ.
  Counsel for Plaintiffs
60 East 42nd Street
New York, NY 10165

ROEMER WALLENS GOLD & MINEAUX LLP           MATTHEW J. KELLY, ESQ.
  Counsel for Defendants
13 Columbia Circle
Albany, NY 12203

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this personal injury action filed by Samantha Good and

Darren Lumbard (collectively, "Plaintiffs") against Peak Resorts, Inc., and Hunter Mountain Ski

Bowl, Inc. (collectively, "Defendants"), is Defendants' motion for summary judgment pursuant

to Fed. R. Civ. P. 56 and Plaintiffs' motion for partial summary judgment pursuant to Fed. R.

Civ. P. 56.  (Dkt. Nos. 65, 67.)  For the reasons set forth below, both motions are denied.

## I.    RELEVANT BACKGROUND

### A.    Plaintiffs' Amended Complaint and Relevant Procedural History

Generally, liberally construed, Plaintiffs' Amended Complaint alleges that Plaintiff Good sustained injuries while snowboarding at Hunter Mountain on January 19, 2019, and that her injuries were a result of Defendants' recklessness, carelessness, and/or negligence with respect to their construction and/or failure to maintain portions of the Broadway Quad ("B-lift") unloading area. (Dkt. No. 16, at ¶¶ 10-47.) Plaintiffs' Amended Complaint also asserts a derivative cause of action on behalf of Plaintiff Lumbard, for his alleged loss of services and companionship from his wife, Plaintiff Good. (*Id.* at ¶¶ 48-52.)

On July 8, 2021, Defendants filed their motion for summary judgment. (Dkt. No. 65.) The next day, Plaintiffs filed their partial motion for summary judgment on the issue of liability. (Dkt. No. 67.) On July 29, 2021, Plaintiffs filed their opposition to Defendants' motion, and on July 30, 2021, Defendants filed their opposition to Plaintiffs' motion. (Dkt. Nos. 69, 73.) On August 5, 2021, Defendants filed their reply in support of their partial motion for summary judgment, and the next day, Plaintiffs filed their reply in support of their motion for summary judgment. (Dkt. Nos. 77, 79.)

**B.     Undisputed Material Facts on Defendants' Motion for Summary Judgment**

The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiffs or denied by them without appropriate record citations in their response thereto. (*Compare* Dkt. No. 65-33 [Defs. Rule 7.1 Statement], *with* Dkt. No. 69-1 [Plfs.' Rule 7.1 Response].)

1.     On January 19, 2019, Defendant Hunter Mountain Ski Bowl, Inc., was the operator of a ski and snowboard resort known as Hunter Mountain in Hunter, New York (hereinafter "Hunter Mountain"). (Dkt. No. 19.)

2.      Hunter Mountain has several chair lifts, one of which is known as the "B-Lift." The B-Lift is a quad lift, meaning it can carry four passengers in each chair. (Dkt. No. 65-28, at ¶ 19.)

3.      The B-Lift was installed in 1996, and the lift has an elevated unloading area. (Dkt. No. 65-10, at 11-12.)

4.      The unloading platform at the B-Lift is particularly large. It was widened to allow additional room for passengers to get around other people on the ramp when unloading and is now five times the size of a normal chair lift unloading ramp. (Dkt. No. 65-12, at 56; Dkt. No. 65-10, at 11-12.)

5.      The unloading platform is initially 26 feet wide and then widens to 36 feet. (Dkt. No. 65-28, at ¶ 10.)

6.      At the end of the horizontal board fence, the structure of the fencing changes and angles outward and away from the horizontal board fence. (Dkt. No. 65-21; Dkt. No. 65-22.)

7.      Snow fences are frequently utilized at ski areas to catch and hold snow in place and to serve as warnings to skiers about areas they should avoid. (Dkt. No. 65-28, at ¶ 12; Dkt. No. 65-12, at 38.)

8.      Snow fences provide the structure that allows snow to accumulate. (Dkt. No. 65-11, at 42-47, 100.)

9.      Snow grooming equipment is used to groom snow on trails, including on the ramp. (Dkt. No. 65-28, at ¶ 13.)

10.      Snow grooming equipment includes the use of a tiller at the rear of a grooming machine which breaks up and smooths the snow. (Dkt. No. 65-28, at ¶ 13.)

3

11.     Plaintiff Good purchased a lift ticket to snowboard at Hunter Mountain on January 19, 2019. She came with her husband, Darren Lumbard, and her two children. (Dkt. No. 65-6, at 96.)

12.     Plaintiff Good considered herself an intermediate- or advanced-level snowboarder; she had initially learned the activity in France or Switzerland and had been snowboarding at many other ski areas in the past, including Vail and the Poconos. (Dkt. No. 65-6, at 90-92.)

13.     Plaintiff Good testified that she "assumed risk for snowboarding down slopes, not holes and fences, or safety fences or that type of thing." (Dkt. No. 65-6, at 98.)

14.     Plaintiff testified that she understood that "[t]here is certainly some risk involved in getting off the lift," but that "the risk involved with holes and fences that shouldn't be there, [she] [didn't] assume [that] risk." (Dkt. No. 65-6, at 99.)

15.     Hunter Mountain's Trail Guide for the 2018-2019 season contained a warning which referenced Article 18 of the New York General Obligations Law and a Skier and Rider Responsibility Code; both provided warnings about the inherent risks of skiing and snowboarding. (Dkt. No. 65-17.)

16.     Plaintiff Good reviewed the Hunter Mountain Trail Map on January 19, 2019, to determine what trails on which her family would snowboard and what chairlifts they would ride, giving her the opportunity to further review those warnings. (Dkt. No. 65-6, at 102.)

17.     Plaintiff Good's lift ticket contained additional warnings; printed in blue ink on the front of the lift ticket are the words:

> STOP! BEFORE AFFIXING THIS TICKET OR ALLOWING
> TICKET TO BE AFFIXED TO YOUR PERSON, READ AND

UNDERSTAND THE NOTICE ON THE REVERSE AND THE
"WARNING TO SKIERS" WHICH IS DISPLAYED WHERE
TICKETS LIKE THIS ARE PURCHASED.

(Dkt. No. 65-6, at 96-97; Dkt. No. 65-13.)

18.     Printed in red ink on the front of the lift ticket is a red "Stop" sign next to

"NOTICE," as well as the following words:

SKIERS AND SKI LIFT PASSENGERS ARE GOVERNED BY
THE NEW YORK STATE SAFETY IN SKIING CODE
(ARTICLE 18 OF THE NYS GENERAL OBLIGATIONS LAW).
BEFORE AFFIXING TICKET OR ALLOWING TICKET TO BE
AFFIXED TO YOUR PERSON, YOUR ATTENTION IS
DIRECTED TO A POSTED "WARNING TO SKIERS" WHICH
IS DISPLAYED WHERE TICKETS LIKE THIS ARE
PURCHASED. NEW YORK LAW REQUIRES THAT YOU
SEEK OUT, READ, REVIEW AND UNDERSTAND THAT
"WARNING TO SKIERS" BEFORE YOU DECIDE TO
PARTICIPATE IN THE SPORT OF SKIING.

SKIING IS AN INHERENTLY DANGEROUS SPORT WHICH
CAN RESULT IN PERSONAL INJURY, INCLUDING
CATASTROPHIC INJURY, DEATH OR PROPERTY
DAMAGE. IF YOU ARE NOT WILLING TO ASSUME THE
RISKS SET FORTH ON THE "WARNING TO SKIERS", YOU
AGREE THAT ALL DISPUTE UNDER THIS CONTRACT
AND/OR LAWSUITS ARISING FROM USE OF THE
FACILITIES AT HUNTER MOUNTAIN SHALL BE
LITIGATED EXCLUSIVELY IN THE SUPREME COURT OF
THE STATE OF NEW YORK, COUNTY OF GREENE, OR IN
THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK.

(Dkt. No. 65-6, at 98; Dkt. No. 65-18.)

19.     Either Plaintiff Good or her husband, Plaintiff Lumbard, affixed this lift ticket to

Plaintiff Good's jacket on January 19, 2019. (Dkt. No. 65-6, at 97.)

20.     Plaintiff Good, Plaintiff Lumbard, and her children then proceeded to ride the B-Lift to the top, disembarked, and skied and snowboarded down the Off Broadway, Gateway, and Mossy Brook trails to the base of the mountain. (Dkt. No. 65-6, at 102-04; Dkt. No. 65-15.)

21.     Plaintiff experienced no difficulty getting on or off the B-Lift the first time up the mountain prior to her first trail run. She unloaded from the chair, snowboarded down the unloading ramp, and navigated the snow conditions without issue. (Dkt. No. 65-6, at 104-05; Dkt. No. 65-7, at 35-36.)

22.     After their first trail run, Plaintiff and her family rode B-lift a second time that day. Again, they had no problem getting on the lift and no challenge getting off the lift. (Dkt. No. 65-6, at 105-06.)

23.     Plaintiff Good unloaded off the chair and onto the ramp. (Dkt. No. 65-6, at 109.)

24.     Upon unloading from the lift chair, Plaintiff Good's left foot was strapped into the front of her snowboard, her right foot was not strapped in, and she moved to the right as she descended the ramp. (Dkt. No. 65-6, at 110.)

25.     Plaintiff stated that she moved to the right of the unloading ramp because there were a lot of people on the ramp. (Dkt. No. 65-6, at 109.)

26.     The operating log for B-lift reflects that the lift was stopped seven times that day – two times due to skier/snowboarder error at the bottom and five times due to skier/snowboarder error at the top. The last stop recorded occurred at 12:13 p.m. (Dkt. No. 65-18.)

27.     As she exited the chairlift, Plaintiff moved to the right. She described what happened next: "So, I moved to my right, and as I did that, my board caught some ice, and I went

further to the right, and I ended up in the groove with the rear of my board against the fence, but it was icy, and my board started increasing in speed down the ramp." (Dkt. No. 65-6, at 110.)

28.     The back of Plaintiff Good's board "was against the fence the whole time until the end of the fence" with "sufficient space for [the] snowboard to be at an awkward angle." (Dkt. No. 65-6, at 111, 114.)

29.     Plaintiff Good's speed increased as she went down the ramp and she was unable to turn away from the fence until she had reached the end. (Dkt. No. 65-6, at 111.)

30.     Plaintiff began to turn the rear of her snowboard counterclockwise to try to stop. (Dkt. No. 65-6, at 110, 115-16; Dkt. No. 65-15.)

31.     At the end of the horizontal board fence, Plaintiff came to a stop. (Dkt. No. 65-6, at 120.)

32.     Plaintiff was directly adjacent to the "snow fence"[1]; her snowboard slid into a void in the snow in the area, and she lost her balance and sat down, at which point she fell through the snow fence and to the ground below. (Dkt. No. 121.)

33.     Richard "Rick" Hoyt ("Hoyt") is the only person known to directly witness Plaintiff Good fall through the fence. In a statement made after the incident, he wrote:

> A middle aged woman was on skiers right side of chair left foot strapped in she got off with 3 others. She was fading down the ramp, body perpendicular to side of ramp. She slip (*sic*) on her heel edge, landed on butox (*sic*) at bottom of fence, slid into a snow well, fell through missing slat of fence backwards head first 10 feet below.

---

[1]     For ease of reading, the Court refers to the fence with the missing board as the "snow fence." However, the Court recognizes that the exact name for this fence, as well as its purpose, is disputed by the parties, which the Court addresses in a subsequent portion of this Decision and Order.

> I was on skier's right of ramp strapping in, facing up towards lift. I saw her fall on her butox (*sic*) then into the well when her torso went backwards through the missing slat of fence followed by her feet and attached snowboard.

(Dkt. No. 65-15.)

34.     Hoyt was a Hunter Mountain Ski Instructor at the time; however, he passed away in the spring of 2020, prior to being deposed in this matter. (Defs.' Fed. R. Civ. P. 26 Initial Disclosures.)

35.     On January 19, 2019, Robert McDevitt ("McDevitt") was the Director of Ski Patrol at Hunter Mountain. (Dkt. No. 65-9, at 5.)

36.     McDevitt heard a call on the Ski Patrol radio that the subject accident had occurred, and he took a snowmobile up to the scene to transport Plaintiff Good. (Dkt. No. 65-9, at 27-28.)

37.     When he arrived at the scene, McDevitt saw Ski Patrollers assisting Plaintiff Good, who pointed up to the fence, where McDevitt saw a hole which she indicated she had fallen through. (Dkt. No. 65-9, at 28-29.)

38.     When he responded to the scene of the accident, it was the first time McDevitt had ever noticed that the fence appeared to be missing a board, creating a hole, and he did not know how long it had been there. (Dkt. No. 65-9, at 17-18.)

39.     On January 19, 2019, Christopher Bezuyen ("Bezuyen") was employed by Hunter Mountain as a Ski Patroller. (Dkt. No. 65-8, at 7.)

40.     Bezuyen did not witness Plaintiff Good's accident or see her at the accident scene, but he performed an incident inspection of the area approximately 30 minutes after it had

occurred. In doing so, he took a series of photographs showing the conditions as they appeared at that time. (Dkt. No. 65-8, at 14, 30; Dkt. No. 65-21.)

41.     On January 19, 2019, Joel Halsey ("Halsey") was a volunteer Ski Patroller at Hunter Mountain. (Dkt. No. 65-11, at 9-10, 29.)

42.     Halsey arrived at the accident scene to assist Plaintiff Good, and she told him that she had fallen through the hole in the fence. (Dkt. No. 65-11, at 44.)

43.     Halsey completed an Incident Report Form, which listed Plaintiff Good as the "Injured Person," relating to the subject accident. (Dkt. No. 65-11, at 52-53; Dkt. No. 65-14.)

44.     Halsey stated that there were only three people on the unloading ramp when he responded to the call. (Dkt. No. 65-11, at 94.)

45.     Ski Patrol members regularly ride the lifts in order to reach trails, and if they notice any issues on a lift or trail they address that issue. (Dkt. No. 65-8, at 50-51.)

46.     The B-Lift is a highly utilized lift at Hunter Mountain, but no one testified that they had been aware of any issues, including a gap or a missing board, with the snow fence in that area at any time.[2]

47.     Plaintiff commenced an action against Defendants alleging negligence for injuries sustained in the incident. (Dkt. No. 16.)

48.     As part of that action, Defendants had a ski area expert, Mark Petrozzi ("Petrozzi"), investigate the incident. Petrozzi summarized the accident as follows:

>       The plaintiff, upon disembarking, chose to snowboard towards the

---

[2]     Defendants did not provide a record cite in support of this fact, but because Plaintiffs do not dispute it and because the fact addresses the lack of evidence of something (i.e., that no one testified that they were aware of issues with fence), the Court finds that it is undisputed.

horizontal board fence, so that, as she testified, her board was jammed up against it. She continued to descend the slope in the area of ungroomed snow immediately adjacent to the fence which prevented her from turning in a direction back on to the groomed slope, due to her proximity to the fence and the ungroomed snow surface off the groomed slope. As a result, being unable to turn, she accelerated and she came to the end of the ramp, she lost control upon attempting to stop and once on the ground, slid through the void in the snow pack at the base of the snow fence.

(Dkt. No. 65-28, at ¶ 20.) Petrozzi concluded that Plaintiff had breached her duties to "be in constant control of speed and course at all times," as required by New York State Code, and that the incident "was occasioned by the plaintiff's inability to control her speed and course, because she had chosen to snowboard too close to the fence into the area of ungroomed snow, which prevented her from turning her board, due to proximity to the fence and irregular, ungroomed snow surface, so that she could not slow or stop her descent." (Dkt. No. 65-28, at ¶¶ 21, 23.)[3]

**B.     Undisputed Material Facts on Plaintiffs' Motion for Summary Judgment**

The following facts were asserted and supported with accurate record citations by Plaintiffs in their Statement of Material Facts and either expressly admitted by Defendants or denied by them without appropriate record citations in their response thereto. (*Compare* Dkt. No. 67-2 [Plfs.' Rule 7.1 Statement], *with* Dkt. No. 73 [Defs.' Rule 7.1 Response].)

1.     At all times set forth in Plaintiffs' Amended Complaint, Defendant Peak Resorts Inc., owned Defendant Hunter Mountain Ski Bowl, Inc. (Dkt. No. 67-4.)

---

[3]     The Court notes that this undisputed fact is merely stating that Petrozzi, as Defendants' expert, investigated and stated that these were his findings. As the Court discusses in subsequent sections of this Decision and Order, the substance of Petrozzi's findings gives rise to disputes of fact that survive the pending motions.

2.      At all times set forth in Plaintiffs' Amended Complaint, Defendant Hunter

Mountain Ski Bowl, Inc., was the owner of the ski and snowboard resort known as Hunter

Mountain, which was located at 64 Klein Avenue, Hunter, New York. (Dkt. No. 19, at ¶ 1.)

3.      From the fall of 2015 up until the incident out of which this cause of action arises,

the general manager of the ski and snowboard resort known as Hunter Mountain was an

employee of Defendant Peak Resorts, Inc. (Dkt. No. 67-4.)

4.      At all times set forth in Plaintiffs' Amended Complaint, Defendant Hunter

Mountain Ski Bowl, Inc., was participating in the management, operation, and maintenance of

the ski and snowboard resort known as Hunter Mountain. (Dkt. No. 67-4.)

5.      Plaintiff Good, who was 42 years old at the time of the incident complained of, is

a pharmaceutical company executive with a Ph. D. in molecular immunology and the mother of

two young children. (Dkt. No. 67-5, at 7, 44.)

6.      Prior to the incident out of which this cause of action arose, Plaintiff Good was a

marathon runner, triathlete, and experienced snowboarder of intermediate to advanced skill.

(Dkt. No. 67-17, at 10-11; Dkt. No. 67-5, at 92.)

7.      In January of 2019, Plaintiff Good booked an Airbnb in Hunter, New York, so

that she and her family could spend the Martin Luther King, Jr., holiday weekend skiing and

snowboarding at Hunter Mountain Resort (hereinafter referred to as "Hunter"). (Dkt. No. 67-5, at

5, 7, 13, 93-94.)

8.      Plaintiff Good had never skied or snowboarded at Hunter prior to January 19,

2019. (Dkt. No. 67-5, at 93.)

9.      Saturday, January 19, 2019, was a clear chilly day and Plaintiff Good, her

husband, Plaintiff Lumbard, and two children arrived at Hunter mid-morning. (Dkt. No. 67-5, at

44, 95-96.)

10.      Plaintiff Good considered the children to be fairly proficient at snowboarding and

skiing for their respective ages and planned on the family taking green beginner and blue

intermediate trails. (Dkt. No. 67-5, at 95, 102.)

11.      Plaintiff Good reviewed the trail map to decide which lift to go on and decided to

take the Broadway quad chair lift (hereinafter referred to as the "B-Lift" or "B-Lift quad")

which, as its name implies, seats four people. (Dkt. No. 67-5, 102-103.)[4]

12.      The B-lift unloading area is elevated approximately 10 to 15 feet off the ground

and is approximately 65 feet long and approximately 35 feet wide, with fences on both sides.

(Dkt. No. 67-13, at 30-31; Dkt. No. 67-9, at 20.)

13.      The B-lift has the only elevated unloading area at Hunter Mountain and is the

only one with fences on either side. (Dkt. No. 67-13, at 15.)

14.      The fact that the unloading area is elevated high enough off the ground to have a

passageway running underneath it is unique not just to Hunter Mountain, but to ski areas in

general. (Dkt. No. 67-16, at 149.)

---

[4]      Although Defendants deny this factual assertion, the only portion of it that they challenge
is the final statement that the B-Lift "provided access to several green trails." (Dkt. No. 73, at 2.)
The Court agrees that the cited testimony does not include that language, so it is not part of the
undisputed fact. However, because Defendants did not challenge the rest of Plaintiffs'
undisputed factual assertion, the Court admits the rest of the factual assertion as undisputed and
will do the same for any other fact where Defendants challenge only a portion of it.

15.    Plaintiff Good and her family boarded the B-lift quad in the same manner that they had boarded quad chairlifts many times before, with Plaintiff Good sitting on the far right, her son to her left, her daughter to the left of her son, and Plaintiff Lumbard on the far left. (Dkt. No. 67-5, at 103.)

16.    Plaintiff Good's left foot was strapped into the snowboard and her right foot was not strapped into any binding. McDevitt confirmed that, when snowboarders get off a lift, they have only one boot strapped in. (Dkt. No. 67-5, at 118; Dkt. No. 67-10, at 23.)

17.    It is necessary for snowboarders to remove one foot when using a chairlift because they cannot move with both feet strapped in unless they are pointed downhill. (Dkt. No. 65-11, at 32.)

18.    Hunter Mountain attracts busloads of skiers from the New York City area and is generally considered to be a crowded mountain, especially on holiday weekends. (Dkt. No. 67-9, at 27-28.)

19.    When Plaintiff Good exited the B-lift chairlift for the first time, it was "very crowded" and "a little tricky" but still "not particularly difficult" for her to safely exit the unloading ramp. (Dkt. No. 67-5, at 104-105.)

20.    After exiting the B-lift unloading ramp, Plaintiff Good snowboarded back down the mountain with her family on a green trail and immediately got back in line for the B-Lift. (Dkt. No. 67-5, at 105.)

21.    Plaintiff Good and her family had to wait about twenty minutes before boarding the chairlift in the same manner they always did, with Plaintiff Good on the far right. (Dkt. No. 65-6, at 103; Dkt. No. 65-7, at 36-37.)

22.     As the chairlift approached the unloading ramp, Plaintiff Good observed that people were sitting or standing on the unloading ramp in front of them and knew that she would need to move to the right to allow for her son to get by them. (Dkt. No. 67-5, at 106-10.)

23.     Plaintiff Good also knew that people were coming up behind her that were going to need space. (Dkt. No. 67-5, at 110.)

24.     People can fall when disembarking from a chairlift, especially one that services several green trails. (Dkt. No. 67-9, at 89-90; Dkt. No. 67-10, at 25.)

25.     As she exited the chairlift, Plaintiff Good moved to her right to make room for her and her son to get around the people in front of them. (Dkt. No. 65-6, at 110.)

26.     When she moved to the right, Plaintiff Good felt her board catch some ice, at which point she went further to her right and into a groove that ran alongside the fence on the side of the ramp. (Dkt. No. 67-5, at 110, 114.)

27.     The groove was icy and Plaintiff Good's snowboard began to pick up speed, so Plaintiff Good turned her right leg "anticlockwise" in order to stop at the point where the fencing changed from a solid brown fence to a gray fence. (Dkt. No. 65-6, at 110, 115, 119.)

28.     As she completed her turn and attempted to sit down thinking she had come to a final stop, the back of Plaintiff Good's snowboard "hit the lack of snow where the hole was," and which the ski instructor who witnessed the accident referred to as a "snow well." (Dkt. No. 65-6, at 120-21; Dkt. No. 65-15.)

29.     As Plaintiff Good attempted to sit down, she fell backward onto her buttocks, slid into a snow well, and then fell at least 10 feet through an opening in the gray fence that was immediately adjacent to the snow well. (Dkt. No. 67-18; Dkt. No. 67-5, at 121-22.)

14

30.     There was a wooden board, or "slat" as the eyewitness called it, missing from the gray fence through which Plaintiff Good fell. (Dkt. No. 67-18; Dkt. No. 67-19, at 50-52; Dkt. No. 67-10, at 30-32.)[5]

31.     Hunter employee and snowboard instructor Richard Hoyt, who is now deceased, witnessed the incident and gave a written statement to his then supervisor, Hunter's Director of Risk Management, William Snyder ("Snyder"). (Dkt. No. 67-18; Dkt. No. 67-7, at 67.)

32.     In his statement, Hoyt stated that the incident took place on the top of B Lift and described it as follows:

> Normal activity as victims chair unloaded with four people.
>
> A middle aged woman was on skiers right side of chair left foot strapped in she got off with 3 others. She was fading down the ramp, body perpendicular to side of ramp. She slip *(sic)* on her heel edge, landed on butox *(sic)* at bottom of fence, slid into a snow well, fell through missing slat of fence backwards, head first, 10 feet below.
>
> I was on skier's right of ramp strapping in, facing up towards the lift. I saw her fall on her buttox *(sic)* then into the well when her torso went backward through the missing slat of fence followed by her feet and attached snowboard.
>
> I released my student, removed my snowboard and went down to the accident victim who was lying on her back, breathing ok and conscious. She said she couldn't feel her legs. I had the lift operator call ski patrol and stayed until they arrived.

(Dkt. No. 67-18.)

---

[5]     Although the cited testimony does not list this exact fact verbatim, the cited testimony does support the fact as re-written, and Defendants do not provide any contradicting evidence (with a record cite) to dispute that fact. The Court accordingly admits this fact as undisputed.

33.     Prior to the incident, there were no "lollipops" or yellow tape warning of the hole in the fence. (Dkt. No. 67-9, at 48.)

34.     The manner in which Plaintiff Good initially exited the chair lift (i.e., with her left foot in her front binding and her right foot not strapped in) was "totally appropriate." (Dkt. No. 67-16, at 115.)

35.     When riders exit a quad lift, they normally start to spread out and, as the ramp gets wider, they typically separate themselves. (Dkt. No. 67-16, at 117-18.)

36.     The B-lift quad was purchased by Hunter in 1996 from the Poma Corporation and installed by Hunter employees. (Dkt. No. 67-15, at 19.)

37.     The installation included the construction of the elevated wooden ramp with fencing on the side. (Dkt. No. 67-13, at 11-12; Dkt. No. 67-14, at 40-41.)

38.     In the same season the ramp was built, the ramp had to be closed and widened several feet on both sides because it was not wide enough for skiers to separate enough as they skied down it. (Dkt. No. 67-13, at 14-15.)

39.     In its present configuration, the B-lift unloading ramp is approximately 65 feet long and approximately 35 feet wide. (Dkt. No. 67-13, at 30-31.)

40.     The Hunter Ski Patrol is responsible for safety at the mountain. (Dkt. No. 67-8, at 31.)

41.     The Hunter Ski Patrol assigns specific ski patrollers to specific trails every morning to inspect for hazards throughout the day, starting at the top of the trail as designated by the trail sign, and keeps a written log of these inspections. (Dkt. No. 67-10, at 14; Dkt. No. 67-31.)

16

42.     At the time of the incident in which Plaintiff Good was injured, the ski patrol did

not assign *specific* patrollers to inspect either the surface of the ramp or the fences on the ramp.

(Dkt. No. 67-9, at 68; Dkt. No. 67-8, at 25 [emphasis added].)[6]

43.     At his deposition, the Director of the Hunter Mountain Ski Patrol, Robert

McDevitt, marked a photograph to indicate approximately where the trail began; and, based on

where McDevitt marked, the location was beyond the area where Plaintiff Good fell through the

fence. (Dkt. No. 65-9, at 20; Dkt. No. 67-30.)

44.     The groomers groom the ramp either nightly or in the morning, but not during the

day. (Dkt. No. 67-13, at 49; Dkt. No. 67-15, at 51.)

45.     The lift operator maintains the ramp within six feet of the stop button but cannot

go beyond the stop button. (Dkt. No. 67-13, at 39-40.)

46.     The typical causes of a missing or broken fence board is either a groomer striking

the fence or snow load. (Dkt. No. 67-14, at 15-16, 85-87.)

47.     Bruce Transue ("Transue") testified that he drove around the mountain on daily

inspections, and, if something caught a crew member's attention that needed to be repaired, her

or she would document the need for repair on a list that was kept of things to be done. (Dkt. No.

67-14, at 35-36.)

---

[6]     In an attempt to dispute this fact, Defendants cite McDevitt's deposition testimony that
ski patrols conduct two inspections each day, and that during these inspections (as well as
throughout the rest of the day) they are supposed to look for hazards. (Dkt. No. 65-9, at 39-40.)
However, this testimony does not dispute Plaintiffs' fact, which states that *specific* patrollers
were not assigned to inspect either the surface of the ramp or the fences on the ramp.

48.     Defendants kept no records of repairs to fences that they did make. (Dkt. No. 67-12, at 21-22, 27; Dkt. No. 67-14, at 20; Dkt. No. 67-11, at 14; Dkt. No. 67-15, at 38-39, 67.)

49.     The first ski patroller to arrive at the scene of the incident was Halsey, who received a call from the summit on his walkie talkie that there was a "possible" on the B-lift unloading ramp. (Dkt. No. 67-9, at 29-30.)

50.     Halsey is a volunteer ski patroller at Hunter Mountain on weekends. (Dkt. No. 67-9, at 9-10.)

51.     Halsey was very familiar with the B-lift unloading ramp, which he described as being elevated 15 to 20 feet above the ground below it. (Dkt. No. 67-8, at 20.)

52.     When Halsey arrived at the B-lift ramp, there were no hazard markers on the ramp of any kind. (Dkt. No. 67-9, at 48.)

53.     Halsey started to snowboard up the ramp, but the lift operator gestured to him, redirecting him to the area on the ground below the ramp where he found Plaintiff Good lying on her back. (Dkt. No. 67-9, at 35, 37.)

54.     Plaintiff Darren Lumbard showed Halsey the hole in the fence and Halsey observed a missing board at the bottom of the fence. (Dkt. No. 67-9, at 40-41.)

55.     Halsey also observed that some snow "was tunneled out" where the board was missing. (Dkt. No. 67-9, at 41-42.)

56.     When shown the photograph of the snow well marked Exhibit 20, Halsey testified that the photo appeared to be of the "tunneled out" area he had previously referenced but that it was really more of a "funnel" than a "tunnel." (Dkt. No. 67-9, at 65, 107.)

57.     Halsey testified that dimensions of the snow well in the photo he reviewed appeared to be the same as those he observed on the day of the incident. (Dkt. No. 67-9, at 65.)

58.     After attending to Plaintiff Good, Halsey told one of the full-time ski patrollers to put a "lollypop" or "something else" on the unloading ramp and to fix the fence. (Dkt. No. 67-9, at 47.)

59.     Although Halsey estimated that the hole in the fence could be approximately 18 inches "height wise" and approximately 20-30 inches "width wise," he agreed that, because he had not measured the hole, he did not know how long or wide the hole was. (Dkt. No. 67-9, at 66-67.)

60.     Christopher Bezuyen has been a ski patroller at Hunter Mountain since 1996. (Dkt. No. 67-8.)

61.     By the time Bezuyen arrived at the scene of the incident, Plaintiff Good had already been removed. (Dkt. No. 67-8, at 14.)

62.     Bezuyen took the photographs which are marked Exhibits 16, 18, and 19, to "record conditions of the day." (Dkt. No. 67-8, at 17.)[7]

63.     Bezuyen saw a spot in an area of the fence "where another rail could have been" but "didn't see anything that had fallen off that fence that was missing." (Dkt. No. 67-8, at 16.)

---

[7]     Defendants attempt to dispute this fact by stating that "[t]he photos are not in their original condition." (Dkt. No. 73, at 7.) Because this fact merely indicates that Bezuyen took photographs of the conditions that day and references those photographs, the Court does not find that Defendants adequately disputed this fact.

64.     Bezuyen identified a photograph that he had taken of the area on the ramp on which Plaintiff Good had fallen, from "less than fifty feet" away, and pointed out where the missing rail would have been positioned. (Dkt. No. 67-8, at 18-19.)

65.     Bezuyen described the area where the rail was missing as a "hole in the fence." (Dkt. No. 67-8, at 20.)

66.     Bezuyen had no idea how long the hole had been there. (Dkt. No. 67-8, at 20.)

67.     Bezuyen took pictures of the incident scene with a digital camera that he then turned over to William Snyder, the Director of Risk Management at Hunter at the time of the accident. (Dkt. No. 67-8, at 30.)

68.     In addition to taking photos, Bezuyen drew a diagram of the location. (Dkt. No. 67-7, at 73; Dkt. No. 67-38.)

69.     Although Bezuyen was certain that he would have discussed the conditions with Snyder and that a "person going through a fence like this is not a normal occurrence," he did not recall the substance of the conversation, other than that he told him, "I saw a spot in the fence where a person went through." (Dkt. No. 67-8, at 30-31.)

70.     Ski Patrol Director Robert McDevitt has been a full time Ski Patroller at Hunter Mountain since 2002 and the full time Director of the Ski Patrol at Hunter Mountain since 2009. (Dkt. No. 67-10, at 8-9.)

71.     When he heard the call regarding the incident, McDevitt took a snow mobile up to the "top of the B." (Dkt. No. 67-10, at 28.)

20

72. When McDevitt arrived and saw Plaintiff Good laying on the ground, the patrollers, who were already there, pointed up to the fence and said, "she came through there." (Dkt. No. 67-10, at 28.)

73. After visiting the scene, McDevitt told his supervisor, Risk Management Director William Snyder, that there was a piece of fence missing and it needed to be repaired, because as long as the hole was still there someone else could slip through in the same way Plaintiff Good did. (Dkt. No. 67-10, at 30-32.)

74. From November of 2012 until May of 2020, William Snyder was the Director of Risk Management at Hunter Mountain and during the course of his career had given over fifty depositions. (Dkt. No. 67-7, at 6, 15-16.)

75. Snyder was in charge of all safety matters and in charge of training all departments at Hunter Mountain. (Dkt. No. 67-7, at 16-17.)

76. When asked what he had observed upon his arrival at the site of the incident, Snyder testified, "I observed that where she was at, the hole she fell through." (Dkt. No. 67-7, at 48.)

77. Snyder could not remember if he wrote down the measurements of the hole in the fence through which Plaintiff Good had fallen. (Dkt. No. 67-7, at 77-80.)

78. Snyder estimated that it would probably have cost less than $10.00 to replace the board that was missing from the gray slat fence. (Dkt. No. 67-7, at 49.)

**D.   Parties' Briefing on the Pending Motions**

**1.  Defendants' Motion for Summary Judgment**

**a.  Defendants' Memorandum of Law**

Generally, in support of their motion for summary judgment, Defendants argue that Plaintiff Good assumed the risk of injury when she willingly participated in the recreational activity of snowboarding at Hunter Mountain. (Dkt. No. 65-32, at 6.) More specifically, Defendants argue that Plaintiff Good assumed the risks associated with snowboarding off the edge of the groomed surface when exiting the chairlift, getting her snowboard caught in a groove on the ungroomed surface, and then falling backwards into a snow fence that was designed to hold the snow in place on the exit ramp. (*Id.*)

Defendants argue that Plaintiffs' claims are addressed by both the New York Safety in Skiing Code ("the Code"), which delineates the specific obligations of both ski area owners and skiers/snowboarders, and New York State's body of case law on assumption of the risk in skiing. (*Id.* at 7.) Defendants argue that the New York State legislature specifically codified assumption of the risk for skiing/snowboarding when creating the Code, which states that there are a number of risks associated with downhill skiing, including risks that may result in significant injuries. (*Id.*) Defendants argue that skiers/snowboarders are bound by the requirements set forth in the Code and are charged with their knowledge. (*Id.* at 8.) Defendants argue that the Code clearly indicates that skiing and snowboarding has inherent risks that ski facility cannot eliminate and that those who choose to participate, as Plaintiff Good did here, assume the risks of the activity and have a duty to maintain control of their speed and course at all times. (*Id.*)

Defendants further argue that a person who engages in a sport or recreational activity consents to the commonly appreciated risks inherent in and arising out of the nature of the sport generally and that flow from such participation. (*Id.* at 9.) Defendants argue that the doctrine of assumption of the risk is continuously applied in the context of skiing, and that several New

York State courts have granted summary judgment in similar contexts based on this doctrine. (*Id.* at 10.) Defendants argue that, in this case, the incident leading to Plaintiff Good's injuries are the result of a combination of factors,[8] all of which are risks Plaintiff assumed. (*Id.* at 13-14.) Defendants argue that Plaintiffs' lift ticket, which specifically references the requirements of the Code, also outlines the risks of personal injury inherent to skiing and snowboarding, but Plaintiff nonetheless chose to participate in the activity. (*Id.* at 15.)

Defendants argue that, to the extent Plaintiffs argue that the alleged hole in the snow fence through which Plaintiff Good allegedly fell unreasonably increased the risk of injury such that she could not assume the risk, Plaintiff Good nonetheless was snowboarding at the time of the incident in an area in which she should not have been and fell. (*Id.* at 17.) Defendants argue that the snow fence, which was outside the boundaries of the slope or trail and not on skiable terrain, was not acting as a barrier fence. (*Id.*)

### b.  Plaintiffs' Opposition Memorandum of Law

Generally, in opposition to Defendants' motion for summary judgment, Plaintiffs set forth four arguments. (Dkt. No. 69.)

First, Plaintiffs argue that the Court should not consider Defendants' expert's affidavit because it contradicts his prior sworn testimony and is not based on evidence in the record. (*Id.* at 19.)

Second, Plaintiffs argue that falling at least ten feet through a hole in a fence on a man-

---

[8]     Specifically, Defendants argue that "the[] risks of icy surfaces, ruts in the snow surface, ungroomed off-trail locations, and snow fences (that act as boundaries and not as solid barriers) are risks skiers and snowboarders assume as part of the sport." (Dkt. No. 65-32, at 14.)

made unloading ramp seconds after disembarking from the chairlift and before having the opportunity to strap into a snowboard is not a risk inherent to the sport of snowboarding. (*Id.* at 21.) More specifically, Plaintiffs argue that, although there is some risk of injury inherent in loading, riding, and unloading from a chairlift, those risks do not insulate a ski area from claims of negligent maintenance that unduly enhanced the level of risk. (*Id.*) Plaintiffs argue that the Court, in determining whether a risk has been unduly enhanced, must consider "whether the conditions caused by the defendants' negligence are unique and created a dangerous condition over and above the usual dangers that are inherent in the sport," as well as whether Plaintiff Good had "knowledge of the injury-causing defect" and "appreciation of the resultant risk . . . ." (*Id.* at 22 [quoting *Morgan v. State of New York*, 90 N.Y.2d 471, 485-86 (1997)].) Plaintiffs argue that Plaintiff Good's deposition testimony shows that, although she was aware of risks associated with disembarking from a chairlift, she was not aware of the risk of falling through a hole in a fence on the side of an unloading ramp. (*Id.*)

Plaintiffs additionally argue that, even if the snow fence was not a safety feature intended to act as a "barrier" to prevent people from sliding off the ramp, it should be a safety feature because the elevated ramp does not end where the brown "barrier" fence did. (*Id.*) Plaintiffs argue that snow fences are also safety features intended to keep snow on the trails and slopes because the absence of snow creates a dangerous condition. (*Id.*) Plaintiffs argue that the snow fence is the only thing separating the unloading ramp from the ten-foot drop off a 35-foot-wide chairlift exit ramp which Defendants knew could become crowded and on which skiers and snowboarders are expected to fan out towards the fences. (*Id.* at 23.) Plaintiffs argue that, in constructing the ramp high off the ground and then failing to maintain the fence so that it could

adequately protect the side of the ramp, Defendants created a risk that is not inherent to the sport of skiing and snowboarding but rather is a dangerous condition occurring in the ordinary course of the property's maintenance. (*Id.*)

Plaintiffs further argue that, although the Code imposes certain duties related to skiing and snowboarding, those duties are not exclusive, and a traditional common-law analysis must be applied to accidents regarding which the Code does not specifically address a particular hazardous condition. (*Id.* at 23-24.) Plaintiffs argue that, as property owners and managing agents, Defendants have a duty to maintain their facilities in a reasonably safe condition. (*Id.* at 24.) Plaintiffs argue that, given the nature of the injuries that would likely ensue if any individual using the B-lift exit ramp were to fall off of it, and the fact that Defendants could have avoided this risk by purchasing a $10.00 piece of wood and nails to repair the fence, Defendants' failure to inspect and maintain the fence was a breach of Defendants' common law duty to maintain their property in a reasonably safe condition. (*Id.*) Plaintiffs argue that the cases upon which Defendants rely are not applicable in this lawsuit, because, in each case, the plaintiff was injured after losing control as a result of natural variations in the surface terrain of the mountain – a fact pattern Plaintiffs allege is not present in this case. (*Id.* at 25.) Plaintiffs argue that a rational factfinder could conclude only that Plaintiff Good's injuries are a result of Defendants' lack of due care in constructing and maintaining the B-lift unloading ramp—a feature unique to Hunter Mountain that creates a dangerous condition that is not obvious, common, or fully comprehended. (*Id.* at 27.)

Third, Plaintiffs argue that they did not assume the risk of Defendants breaching their statutory duty to either mark or remove the snow well created as a result of the missing slat in the

fence. (*Id.*) Plaintiffs argue that the Hunter Mountain Ski Patrol limited the twice-daily inspections and marking of hazards required by N.Y. General Obligations Law §§ 18-103(6) and 18-103(13) to designated trails and did not systematically inspect the B-lift unloading ramp. (*Id.* at 28.) Plaintiffs argue that Defendants accordingly breached their statutory duties because these written inspections include "any area designated by the ski area operator for skiing." (*Id.*) Plaintiffs argue that, when asked why the Ski Patrol did not regularly inspect the unloading ramp in the same manner that they inspected the trails, the Director of the Ski Patrol, Robert McDevitt, responded that he did not have an answer for that and, in light of what happened to Plaintiff Good, they probably should have. (*Id.*)

Fourth, Plaintiffs argue that they did not assume the risk of Defendants violating the regulations promulgated by the New York Commissioner of Labor, which require Defendants to protect the elevated unloading ramp on all sides. (*Id.* at 29.) Plaintiffs argue that Defendants violated 12 NYCRR § 32.13, which requires that "elevated loading areas shall be protected on all sides by guardrails, safety nets or ramps." (*Id.*) Plaintiffs argue that the drafters of the regulations would not have added the requirement that "elevated loading areas be protected on all sides" in the section entitled "unloading areas," unless they intended it to apply to elevated unloading areas, as well. (*Id.*) Plaintiffs argue that this interpretation means that Defendants failed to adequately protect the B-lift ramp on all sides and violated that regulation. (*Id.* at 29-30.)

### c.  Defendants' Reply

Generally, in reply to Plaintiffs' opposition, Defendants set forth four arguments. (Dkt. No. 77-7.)

First, Defendants argue that Plaintiffs may not rely on videos attached to Plaintiff

Lumbard's affidavit because they did not disclose the videos to Defendants prior to including them in their motion. (*Id.* at 4.) More specifically, Defendants argue that these videos, which Plaintiff Lumbard took at the scene of the incident two days after it occurred, are responsive to their Rule 26 initial disclosures, as well as multiple interrogatories from Defendants, but Plaintiffs nonetheless did not provide these videos to Defendants. (*Id.* at 5.) Defendants argue that Fed. R. Civ. P. 26 and 37 prohibit Plaintiffs from using the videos to support their opposition memorandum of law, because failure to provide these materials was not substantially justified or harmless. (*Id.* at 6.)

Second, Defendants argue that Petrozzi's affidavit does not contradict his testimony and the Court may therefore consider it.

Third, Defendants argue that Plaintiffs misrepresent Plaintiff Good's deposition testimony regarding her position as she traveled down the unloading ramp. (*Id.* at 10.) More specifically, Defendants argue that Plaintiffs fail to address the fact that Plaintiff Good ended up adjacent to the snow fence only because she lost control while snowboarding down the unloading ramp on an ungroomed surface and that Defendants have no duty to maintain the off-trail snow fence in the area past the horizontal board fence. (*Id.*) Defendants argue New York State courts repeatedly affirm the principle that a recreational facility owner does not have to provide perfectly safe conditions and that participants assume the risk of suboptimal conditions. (*Id.* at 11.) Defendants argue that Plaintiffs fail to acknowledge that, even if the conditions she complains of were considered "suboptimal," they were located off-trail, in an area where Plaintiff Good was not intended to be, and there is no requirement that a ski facility provide perfectly safe conditions everywhere. (*Id.*)

27

Fourth, Defendants argue that they did not violate any statutory or regulatory requirements. (*Id.* at 13.) More specifically, Defendants argue that they did inspect the open slopes or trails twice a day, as required by statute, and that there was no failure to "conspicuously mark" any "obstacles or hazards which are located within the boundaries of any ski slope or trail" because the snow fence was located off trail and not within the boundaries of a ski slope or trail. (*Id.*) Defendants further argue that Plaintiffs' claim that Defendants should have protected the unloading area is irrelevant because the location where Plaintiff Good fell was beyond the unloading ramp. (*Id.*)

## 2. Plaintiffs' Motion for Partial Summary Judgment

### a. Plaintiffs' Memorandum of Law

Generally, in support of their motion for partial summary judgment on the issue of liability, Plaintiffs set forth five arguments. (Dkt. No. 67-1.)

First, Plaintiffs argue that Plaintiff Good did not assume the risk of Defendants' failure to maintain the fence in a reasonably safe condition. (*Id.* at 25.) More specifically, Plaintiffs argue that the risk inherent in the use of a chairlift does not insulate a ski area from claims of negligent maintenance that unduly enhance the level of risk. (*Id.* at 25-26.) Plaintiffs argue that, even if the snow fence is not a safety feature (which Plaintiffs dispute) and is meant only to keep snow on the ramp, this is a distinction without a difference, because the absence of snow creates a dangerous condition. (*Id.* at 27.) Plaintiffs argue that Hunter's Director of Ski Patrol testified at his deposition that the missing slat on the fence interfered with its ability to hold snow and contributed to the creation of the snow well that drew Plaintiff Good in the direction of the fence. (*Id.* at 27.) Plaintiffs argue that, no matter the intended purpose of the fence, it is undisputed that

28

it is the only structure protecting skiers and snowboarders from a 10-foot drop off a 35-foot-wide chairlift exit ramp that Defendants know can become crowded and on which skiers and snowboarders are expected to "fan out" toward the fences. (*Id.*)[9]

Second, Plaintiffs argue that Defendants breached their statutory duty to sufficiently warn Plaintiff Good of the existence of the dangerous drop off created as a result of a missing slat in the fence. (*Id.* at 28.) More specifically, Plaintiffs restate the arguments they include in their opposition motion regarding Defendants' failure to properly inspect and mark hazards, as required by N.Y. General Obligations Law §§ 18-103(6) and 18-103(13).[10] (*Id.* at 29-31.)

Third, Plaintiffs argue that Defendants violated the regulations promulgated by the New York Commissioner of Labor, which require them to protect the elevated unloading ramp on all sides. (*Id.* at 29.) More specifically, Plaintiffs restate the arguments they include in their opposition motion regarding Defendants' alleged violation of 12 NYCRR § 32.13, which requires that "elevated loading areas shall be protected on all sides by guardrails, safety nets or ramps."[11] (*Id.* at 31-32.)

Fourth, Plaintiffs argue that Plaintiff Good complied with all the duties imposed on her as a snowboarder by N.Y. General Obligations Law § 18-105. (*Id.* at 32.) Plaintiffs argue that there

---

[9]    Plaintiffs additionally restate their arguments from their opposition memorandum of law regarding the role that the Code and common law plays when one is analyzing accidents involving a particular hazardous condition not specifically addressed by the Code. *See supra* Section I.D.1.b.; (Dkt. No. 67-1, at 28-29.)

[10]    The specifics of this argument are outlined above in Part I.D.1.b. of this Decision and Order, where the Court restates the arguments in Plaintiffs' opposition motion.

[11]    The specifics of this argument are outlined above in Part I.D.1.b. of this Decision and Order, where the Court restates the arguments in Plaintiffs' opposition motion.

is nothing in the evidence implying that Plaintiff Good is at fault for the events leading to her injuries, but rather that the incident resulted from Defendants' failure to fulfill their common law and statutory duties to maintain their property and inspect/mark hazards. (*Id.* at 32-33.)

Fifth, Plaintiffs argue that, even were the Court to find that a genuine issue of material fact exists regarding whether any comparative negligence exists on Plaintiff Good's part, the Court should still grant summary judgment in Plaintiffs' favor as to liability. (*Id.* at 33.) More specifically, Plaintiffs argue that the evidence shows that Defendants breached their duty to maintain the fence in a reasonably safe condition, which substantially contributed to Plaintiff Good's injuries. (*Id.* at 34.) Plaintiffs further argue that, because the evidence supports a finding of liability against Defendants, even if the Court finds an issue of fact regarding any culpable conduct on behalf of Plaintiff Good, the only issue to present to the jury relates to damages. (*Id*.)

### b. Defendants' Opposition Memorandum of Law

Generally, in opposition to Plaintiffs' motion for summary judgment, Defendants set forth six arguments. (Dkt. No. 73-16.)

First, Defendants argue that Plaintiff Good assumed the risk of injury when she went snowboarding at Hunter Mountain, and therefore is not entitled to summary judgment on liability. (*Id.* at 11.) More specifically, Defendants argue that, because the risks associated with losing control due to snow conditions and sliding off-trail are inherent to the sport, Plaintiff Good assumed the risk of her injuries. (*Id.*) Defendants argue that Plaintiff Good found herself off-trail and next to the snow fence because of the snow surface conditions on the unloading ramp—conditions that are accepted by participants as a matter of law as set forth in the Code. (*Id.* at 12.) Defendants argue that, based on the Code, Plaintiff Good statutorily assumed the risk

30

of injury as the result of encountering variations in surface or subsurface snow, ice, ruts, and man-made objects incidental to the provision or maintenance of a ski facility. (*Id.*) Defendants argue that, because the fence at issue was only a snow fence, there is no basis for the Court to find that they have a duty to maintain the snow fence in its off-trail location. (*Id.* at 14.) Defendants argue that Plaintiff Good assumed the risk of the off-trail conditions, even if the conditions were suboptimal, when she decided to snowboard to the right of the unloading platform, hitting ice and getting caught in a rut along the ungroomed surface adjacent to the fence. (*Id.*)

Defendants further argue that the Court cannot reduce this case solely to the issue of the missing piece of the fence, because that would ignore the events preceding Plaintiff Good arriving to that spot. (*Id.* at 15.) Defendants argue that Plaintiff Good arrived at the snow fence because she decided to snowboard to the side of the ramp, where a series of events caused her to lose control and sit down in a location where Hunter Mountain guests were not intended to be. (*Id.* at 15-16.) Defendants argue that the assumption of risk includes this natural sequence of events. (*Id.* at 16.)

Defendants additionally argue that they did not have notice of the missing slat in the snow fence, and it was not foreseeable that Plaintiff would be in the area adjacent to the fence. (*Id.* at 17.) Defendants argue that, although Plaintiffs allege that the missing slat in the fence created a dangerous condition, they have not shown Defendants created that condition or had constructive notice of the missing slat. (*Id.* at 17-18.) Defendants argue that it was unforeseeable that skiers and snowboarders would be in the area immediately adjacent to the snow fence because that area is off-trail and ungroomed. (*Id.* at 18.) Defendants argue that the only way a

31

skier/snowboarder would arrive in this location with their snowboard or skis in a perpendicular position is if the individual lost control of their course (i.e., a violation of the Code) or if they deliberately placed themselves in that position—neither of which are a product of Defendants' alleged failures. (*Id.* at 19.) Defendants argue that courts repeatedly hold that skiers who lose control and slide into fixed objects, like Plaintiff Good did here, assumed the risk of any ensuing injuries. (*Id.* at 20.) Defendants argue that the absence of foreseeability and notice mean that Plaintiffs failed to set forth a prima facie case for liability. (*Id.* at 22.)

Defendants further argue that, even if the missing slat may have furnished the condition for Plaintiff Good's incident, it did not cause it. (*Id.*) Defendants argue that the cause of Plaintiff Good's incident was her loss of control on the off-ramp, which resulted in her sliding down the ramp against the horizontal board fence and ending up next to the snow fence. (*Id.*) Defendants argue that, given it was the collapsed snow that opened up to create a void through which Plaintiff fell, the missing slat itself—at most—furnished the condition for the fall but did not cause it. (*Id.*)

Second, Defendants argue that Plaintiffs did not submit evidence from either of their expert witnesses addressing the liability issues in this case. (*Id.*) Defendants argue that the affidavit of Mark DiNola ("DiNola"), Plaintiffs' ski area expert, addresses only a YouTube video that he found when browsing the Internet and does not provide expert testimony on ski area design or maintenance, duties of skiers or ski patrollers, or a variety of other topics. (*Id.* at 23.) Defendants argue that the affidavit of Christopher Brown ("Brown"), Plaintiffs' hired engineer, simply gives a description of what the B-Lift unloading ramp looked like when he went there, and that he tries to use that information to buttress the validity of Plaintiffs' computer

32

animation—evidence Defendants contend is contradicted by Plaintiffs' deposition testimony. (*Id.* at 23-24.) Defendants argue that the lack of expert opinion supports Defendants' arguments that they did not violate ski industry protocols or engineering principles in a way that contributed to Plaintiff Good's accident. (*Id.* at 24.)

Third, Defendants argue that the Court should exclude Plaintiffs' computer-generated animation evidence because Plaintiffs failed to establish that the animation accurately depicts what occurred on the day of her accident. (*Id.* at 25.) Defendants argue that Todd Davis ("Davis") and Brown, two of Plaintiffs' experts, provided affidavits attempting to validate the accuracy of the animation, but neither witnessed the accident nor has personal knowledge of how it occurred. (*Id.*) Defendants argue that Davis does not state that he reviewed Plaintiff Good's deposition testimony to ensure the animation accurately depicted her claims, and he does not claim he updated the animation after creating it in draft form. (*Id.* at 26.) Defendants further argue that Plaintiffs failed to submit an affidavit confirming the accuracy of the animation. (*Id.* at 27.) Defendants argue that the animation's representations are false and highly prejudicial, that they misrepresent key aspects of the photographic evidence and Plaintiff Good's testimony about how the accident occurred, and that they do not satisfy Fed. R. Evid. 901's authentication requirement. (*Id.* at 27-30.)

Fourth, Defendants argue that they did not violate their statutory duty to warn. (*Id.* at 30.) Defendants argue that the snow fence was not located within the boundaries of any ski slope or trail, but instead was a snow fence located beyond the limits of the groomed surface, making it a man-made object located off-trail. (*Id.* at 31.)

Fifth, Defendants argue that they did not violate the New York State regulation requiring

protection for elevated unloading ramps. (*Id.*) Defendants argue that the regulations do not state that elevated "unloading areas" need to be protected on all sides, but even if they did, there is no evidence that Defendants failed to comply with these requirements. (*Id.*) Defendants argue that the unloading ramp does not extend continuously beyond the unloading area, so the regulation is inapplicable to the snow fence, which is 72 feet away and angled in a manner that makes it out of sight of the top lift operator. (*Id.* at 32.)

Sixth, Defendants argue that the Court should disregard Plaintiffs' YouTube video and associated screenshots when deciding this motion and exclude them from use at trial for lack of authentication. (*Id.*) More specifically, Defendants argue that the affidavit of Brian Walsh ("Walsh"), which Plaintiffs submitted with their motion, is not sufficient to authenticate the YouTube video submitted as Plaintiffs' Exhibit 29. (*Id.*) Defendants argue that Walsh's affidavit contains no details about the program, application, or other method or equipment Walsh used to upload the video to the website, and that Plaintiffs did not provide an affidavit from a YouTube custodian or other qualified individual with personal knowledge that gives reliable details about YouTube's policies and procedures regarding videos uploaded to the website, including whether they are edited or how they are stored and maintained. (*Id.* at 33.) Defendants argue that, because Plaintiffs have not sufficiently authenticated Walsh's YouTube video, the Court cannot consider Plaintiffs' Exhibit 28, which is the photograph DiNola alleges he created from a screenshot of that video. (*Id.* at 34.) Defendants also argue that DiNola is not qualified to create the screenshot image because he failed to sufficiently describe the process of how he created that image, and a comparison to the screenshots submitted by Defendants' counsel show DiNola enlarged, modified, and/or altered the screenshot. (*Id.*)

### c. Plaintiffs' Reply

Generally, in reply to Defendants' opposition, Plaintiffs set forth five arguments. (Dkt. No. 79-1.)

First, Plaintiffs argue that Defendants fail to raise a triable issue of fact from which a jury could rationally conclude that Plaintiff Good assumed the risk of the events leading to her accident. (*Id.* at 6.) Plaintiffs argue that Defendants' repeated assertions that a portion of the ramp was "off-trail" and a place "where guests were not intended to be" is contradicted by the testimony of all the fact witnesses, the photographic evidence, and the deposition testimony of Defendants' expert. (*Id.* at 8.) Plaintiffs argue that Petrozzi not only agreed with Plaintiffs' counsel's characterization of Plaintiff Good's actions regarding "fanning out and using the extra space" on the ramp, but also that he stated that the entire ramp, regardless of how it was groomed, was available for skiers and snowboarders to use. (*Id.*) Plaintiffs argue that Defendants cannot deny paragraphs 41 and 42 of Plaintiffs' Statement of Material Facts, which are premised on Petrozzi's sworn deposition testimony, by relying on Petrozzi's contradicting affidavit. (*Id.* at 9.)

Plaintiffs additionally argue that the photographs Defendants submit in opposition to Plaintiffs' motion, which show skiers and snowboarders sitting on the far-right side of the unloading area not far from where Plaintiff Good's accident occurred, contradict Defendants' contention that it was unforeseeable Plaintiff Good might end up there. (*Id.* at 10.) Plaintiffs argue that one of the photos shows that Defendants actually groomed an area to the right of the ramp, in the direction of the angled fence, for people to stop and strap back into their snowboards and therefore expect that some people will move to the right as they exit the ramp. (*Id.*)

Plaintiffs further argue that, in their counterstatement of facts, Defendants readily concede that, even though Plaintiff Good got caught in an icy groove, she managed to retain enough control over her snowboard to come to a stop as soon as she reached the end of the horizontal board fence, and that she did not fall until she had safely stopped, and the back part of her board dropped into the snow well. (*Id.*)

Plaintiffs finally argue that, when Defendants chose to construct an elevated chairlift unloading ramp, they had an obligation to take reasonable precautions to ensure adequate barriers on all sides for the safety of passengers unloading from the chairlift. (*Id.* at 11.) Plaintiffs argue that, by failing to extend the barrier fence (i.e., a safety feature) the entire length of the ramp, Defendants created a dangerous condition that unreasonably increases the risk of injury. (*Id.* at 11-12.) Plaintiffs likewise argue that Defendants breached their common-law duty to inspect the ramp by having no systematic procedure in place to inspect the fences on the B-Lift. (*Id.* at 12.)

Second, Plaintiffs note that, because Petrozzi's affidavit attempts to change his deposition testimony, Plaintiffs submit the affidavits of Brown and DiNola regarding liability and a supplemental affidavit from Brown addressing the issues Defendants raised about the computer animation. (*Id.* at 13.)

Third, Plaintiffs argue that Defendants breached their statutory duty under New York General Obligations Law § 18-103(6) to conduct twice daily written inspections of the unloading ramp. (*Id.*) Plaintiffs argue that Defendants' opposition is silent as to whether they are required to make inspections of the ramp and that Director of Hunter Mountain Ski Patrol readily admitted that Defendants did not make the twice daily written inspections of the ramp. (*Id.*)

Fourth, Plaintiffs argue that the fact that the lift operator may not be able to see the end of the ramp does not mean that Defendants are not required to have the ramp adequately protected on all sides. (*Id.* at 14.)

Fifth, Plaintiffs argue that the computer animation accurately reflects the Plaintiffs' testimony and is properly authenticated. (*Id.* at 14-15.) Plaintiffs argue that the supplemental affidavits from Brown and Davis show that there were over twenty revisions to the animation based on corrections made after Plaintiffs, Plaintiffs' counsel, and Plaintiffs' engineer reviewed each version. (*Id.* at 15.) Plaintiffs argue that the computer animation is properly authenticated and that its probative value outweighs the danger of unfair prejudice. (*Id.*)

Sixth, Plaintiffs argue that the YouTube video and associated screenshot are sufficiently authenticated. (*Id.* at 15-16.) Plaintiffs argue that Walsh's affidavit establishing the source of the video and what it depicts, as well as Di Nola's affidavit explaining how it was discovered, establish its admissibility. (*Id.* at 15.) Finally, Plaintiffs argue that the challenged screenshots depict the same missing fence slat as Di Nola's affidavit, and there is no reason to believe that the YouTube video has been altered in any way. (*Id.* at 16.)

## II.   LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[12]

---

[12]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the . . . [record] which it believes demonstrate the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[13] Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

---

create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[13]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J) (citing cases).

For these reasons, this Court has often enforced Local Rule 7.1(b)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[14]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[15]

## III.   ANALYSIS

### A.   Whether the Court Should Disregard Portions of Expert Petrozzi's Affidavit When Deciding the Parties' Motions

After carefully considering the matter, the Court answers this question in the affirmative with respect to expert Petrozzi's statements regarding the creation of the snow well, but in the negative with respect to Petrozzi's statements regarding the location where Plaintiffs' injury occurred and the grooming practices at the B-Lift unloading ramp. (Dkt. No. 69, at 19-20.)

---

[14]    Among other things, Local Rule 7.1(b)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(b)(3).

[15]    *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 WL 325378, at *8 (N.D.N.Y. Mar. 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to an "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

Before reaching the merits of the parties' motions, the Court must decide an ancillary issue: whether Defendants' expert, Mark Petrozzi, contradicted his deposition testimony by including certain allegations in his affidavit, and, if so, whether the Court should rely on his affidavit in deciding the parties' motions. "[C]ourts generally should not 'partake in weighing one form of evidence against another at the summary judgment stage.'" *Palumbo v. Provident Trust Grp., LLC*, 19-CV-0252, 2021 WL 1110797, at \*2, n. 3 (N.D.N.Y. Mar. 23, 2021) (Kahn, J.) (quoting *Kurec v. CSX Transp., Inc*., 18-CV-0670, 2020 WL 6484056, at \*2, n.2 (N.D.N.Y. Nov. 4, 2020) (Kahn, J.)). However, "[u]nder the sham affidavit doctrine, 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'" *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 94-95 (S.D.N.Y. Nov. 12, 2020). "[T]his rule does not apply in two situations: (1) where the subsequent sworn statement either does not actually contradict the affiant's prior testimony or addresses an issue that was not, or was not thoroughly, explored in the deposition; and (2) where the deposition testimony at issue is contradicted by evidence other than the deponent's subsequent affidavit." *Fed. Deposit Ins. Corp.*, 500 F. Supp. 3d at 94-95 (internal quotation marks omitted).

Plaintiffs initially argue that the Court should disregard Petrozzi's affidavit because he contradicted his deposition testimony regarding whether Plaintiff was injured "outside the boundaries of the slope" and "not on skiable terrain." (Dkt. No. 69, at 19.) Specifically, Petrozzi's affidavit includes the following statements:

> [T]he hole did not constitute a hazard to be identified and/or remediated by the Defendant ski operator as it was *in an ungroomed area outside the boundaries of a slope or trail; not skiable terrain*. The statute requires the marking or removal of

40

hazards "located within the boundaries of any ski slope or trail." *As the subject snow fence was off the trail*, it is not included within the statutory requirement for marking or removal. Had plaintiff remained on the groomed surface, she would not have been in the area of the fence.

(Dkt. No. 65-28, at ¶ 25 [emphasis added].)

Plaintiffs are correct that, in his deposition, Petrozzi agreed that Plaintiff Good "us[ed] the ramp as it was designed to be used" when she "fann[ed] out and us[ed] the extra space," and that "[a]nything between those . . . two brown fences, was available for people to use . . . ." (Dkt. No. 67-16, at 117-18, 120.) However, later in his deposition, Petrozzi referred to the area where Plaintiff was injured as "off-trail." (*Id.* at 169-72.) He went on to testify as follows:

> [T]he evidence clearly shows that where this hole in the snow, this variation of terrain, this void in the snow was, was outside of the groomed trail, the maintained, prepared surface, which is where Hunter Mountain, as all ski areas, invite the skiers to ski. Does this mean you can't go there? No, it doesn't mean that. But as you can see in the photos, this disturbed area of snow, that has not been groomed, there's no tracks, generally speaking, . . . *that is off trail*.

(*Id.* at 178-79 [emphasis added].)

Based on this testimony, the Court will not disregard Petrozzi's affidavit regarding whether Plaintiff was injured "outside the boundaries of the slope" and "not on skiable terrain." Although it is true that jurors may find Petrozzi's deposition testimony and affidavit to be incongruous, it is their job to make that credibility determination and is not part of the Court's role in deciding summary judgment. *See Fed. Deposit Ins. Corp.*, 500 F. Supp. 3d at 95 ("If a declarant's prior testimony and summary judgment declaration are not in direct contradiction, mere tensions or inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment.").

The Court does not reach the same outcome with respect to Plaintiffs' challenge of paragraph 24 in Petrozzi's affidavit, which states as follows:

> The plaintiff alleges that the hole created by the missing rail in the snow fence beyond the Unload platform of B-Lift was a hazard that allowed her to slide under the fence and fall to the ground below sustaining her injuries. However, given the surface level of the snow surface in the area, *it was not a hole created by the missing fence rail, but a variation in the terrain (a void or hole) in the snowpack that she slid down and through.*

(Dkt. No. 65-28, at ¶ 24 [emphasis added].) Plaintiffs argue that this statement contradicts Petrozzi's deposition testimony, where he stated that he "believe[s] that the evidence is clear that there was a [snow well]" and that "the missing slat may have allowed that snow to have slid." (Dkt. No. 69, at 20 [citing Dkt. No. 67-16, at 125-127].) Defendants argue that "Petrozzi's point was not to contradict the claim that this was a snow well but to point out that the snow surface collapsed in that area because there was a void in the snowpack," which they argue is consistent with his deposition testimony that "it would be speculation on [his] part" as to how the snow well was created. (Dkt. No. 77-7, at 7.)

Petrozzi's deposition testimony on this issue waivers between stating that the missing rail may have caused the snow well, or, alternatively, that he is unsure what caused the creation of the snow well. More specifically, at his deposition, Petrozzi testified that he "believe[s] that the missing slat may have allowed [the] snow to have slid." (Dkt. No. 67-16, at 125-127.) In that same exchange, he also stated that he did not know what caused the snow well and that any testimony regarding the snow well's creation "would be speculation on [his] part." (*Id.*) He further stated that it was possible that some of the snow "may have come down as a result of that [i.e., the missing slat] . . . ." (*Id.*) Petrozzi does not affirmatively testify, however, that "the hole

was not created by the missing fence rail"—the assertion he attempts to make in his affidavit. Petrozzi's deposition show that, at best, Petrozzi's affidavit "'alleges critical, obviously material facts that were not mentioned at [the] deposition.'" *Fed. Deposit Ins. Corp.*, 500 F. Supp. 3d at 95 (quoting *Golden v. Merrill Lynch & Co.*, 06-CV-2970, 2007 WL 4299443, at \*9 (S.D.N.Y. Dec. 6, 2007)). The Court accordingly will disregard the statement in Petrozzi's affidavit that the hole was not "created by the missing fence rail . . . ." (Dkt. No. 67-16, at 127.)

Finally, Plaintiffs argue that the Court should preclude the allegation in Petrozzi's affidavit that the groomers only groomed the snow that was two to three feet away from the fence so that they would not damage fencing. Plaintiffs argue that these statements are fact testimony (not expert testimony) and that the statements are contradicted by the actual fact witnesses. (Dkt. No. 69, at 20-21.) As the Court discusses in depth below, although the question of how the ramp was groomed or should have been groomed is a disputed fact, the Court does not find that it should preclude this portion of Petrozzi's affidavit. Plaintiffs do not argue that these statements contradict Petrozzi's deposition testimony, and a jury could find that Petrozzi's interpretation is supported by photographic evidence from the day of the incident or other witnesses' testimony. (Dkt. No. 65-21, at 10.) The Court therefore will not preclude this portion of Petrozzi's affidavit when deciding the parties' motions.

**B.      Whether the Court Should Grant Defendants' Motion for Summary Judgment**

After carefully considering the matter, the Court answers this question in the negative, for the reasons stated in Plaintiffs' memoranda of law. (Dkt. Nos. 67-1, 69.) To those reasons, the Court adds the following analysis.

Defendants' motion for summary judgment rests on the assumption-of-the-risk doctrine.

43

For Defendants to prevail on their motion, they must show that no dispute of material fact exists regarding whether Plaintiff Good assumed the risk of sustaining her injuries by snowboarding at Hunter Mountain. Defendants argue that they have met this burden, citing both the New York Safety in Skiing Code, which requires snowboarders to be "in constant control of speed and course at all times" and identifies the "risk of personal injury . . . caused by variations in terrain," as well as state common law on assumption of the risk. (Dkt. No. 65-32, at 6-9 [quoting N.Y. Gen. Oblig. Law § 18-101].)

Under New York's common law addressing the assumption of the risk doctrine, "[a] person who chooses to participate in a sport or recreational activity consents to certain risks that are inherent in and arise out of the nature of the sport generally and flow from such participation." *Anand v. Kapoor*, 942 N.E.2d 295, 295 (N.Y. 2010) (internal quotation marks omitted); *Pantalone v. Talcott*, 52 A.D.3d 1148, 1149 (N.Y. App. Div. 3d Dep't 2008). "New York courts have repeatedly observed that 'a participant will not be deemed to have assumed the risk if, due to a defendant's negligence, the risks were unique and resulted in a dangerous condition over and above the usual dangers inherent in the activity.'" *Ward v. Stewart*, 284 F. Supp. 3d 223, 236 (N.D.N.Y. 2018) (Hurd, J.) (quoting *Connor v. Tee Bar Corp.*, 302 A.D.2d 729, 730 (N.Y. App. Div. 3d Dep't 2003)). "[T]he assumption of risk to be implied from participation in a sport with awareness of risk is generally a question of fact for a jury . . . ." *Maddox v. City of New York*, 487 N.E.2d 553, 557 (N.Y. 1985); *Connor*, 302 A.D.2d at 730; *Pantalone*, 52 A.D.3d at 1149.

Defendants argue that, under their interpretation of the allegedly undisputed facts, Plaintiff Good "chose to snowboard towards the side of the ramp, directly adjacent to the

44

horizontal fence," "left the groomed surface of the trail and proceeded onto the ungroomed

surface, taking her off trail," and, upon reaching the end of the horizontal fence, "lost control in

her attempt to stop and sat down, sliding into the void in the snowpack at the base of the snow

fence." (Dkt. No. 65-32, at 16-17.) Defendants assert that "icy surfaces, ruts in the snow

surfaces, ungroomed off-trail locations, and snow fences (that act as boundaries and not as solid

barriers) are risks skiers and snowboarders assume as part of the sport." (Dkt. No. 65-32, at

14.)[16]

The problem with Defendants' argument, however, is that it rests on a variety of disputed

material facts regarding the events leading to Plaintiff Good's fall and subsequent injuries. To

begin, Defendants assert that the B-Lift unloading area was not crowded when Plaintiff Good

and her family disembarked, meaning she "did not have to snowboard to [the right] side; she

chose her route." (Dkt. No. 65-32, at 16.) Defendants support this point by citing the "Return Lift

Operating Log," which shows that operators stopped the B-lift due to crowds multiple times on

the day of the incident but not at the time Plaintiff Good and her family disembarked from the B-

Lift chair. (Dkt. No. 65-18, at 4.) However, Plaintiff Good testified that, "[w]hen [they] arrived

at the top of the lift, [she] observed that there were a lot of people in front of [them]." (Dkt. No.

67-5, at 106-07.) She went on to state that, as she was getting off the chair lift, she "observed

those people, and knew that [she] needed to move to the right to allow for [her] son and [herself]

to get by [the people]," so she "moved to [her] right, and as [she] did that, [her] board caught

---

16      (*See also* Dkt. No. 73-16, at 12 ["Plaintiff found herself off-trail and next to the snow
fence because of the snow surface conditions on the unloading ramp—conditions that are
accepted by participants as a matter of law as set forth in the Safety in Skiing Code."].)

some ice . . . ." (Dkt. No. 67-5, at 109-10.) Whether the B-Lift unloading ramp was actually crowded is a question for the factfinder, who can weigh the opposing evidence to make that determination.

A question of fact likewise remains regarding whether Plaintiff Good ever "lost control" between the time she hit the ice groove adjacent to the fence and the time she fell. Plaintiffs argue that Defendants' inclusion of the following information in their Statement of Facts shows no dispute exists with respect to this issue: "At the end of the horizontal board fence, Plaintiff came to a stop." (Dkt. No. 69, at 27.) However, Plaintiff Good eventually stopping before falling through the snow fence does not mean she was "in constant control of speed and course at all times . . . ." N.Y. Gen. Oblig. Law § 18-101. In fact, Plaintiff Good testified that, although she "wouldn't say [she lost] control, . . . [her] speed was certainly increasing," "it was more difficult to turn because of the groove," and she "was unable to turn away from the fence until the end of the fence." (Dkt. No. 65-6, at 115.) This testimony can support either Plaintiffs' or Defendants' contention about how Plaintiff Good came to be in the position she was in when she fell and sustained her injuries.

The purpose of this specific "snow fence" is also disputed. Specifically, the deposition testimony of the multiple witnesses varies on this issue. Robert Abrahamsen ("Abrahamsen"), the Lift Maintenance Supervisor at Hunter, testified that the purpose of the fence is to "hold the snow on the bridge," and, upon further questioning, stated that he was sure "it's there as a guide for everybody to go down . . . ." (Dkt. No. 65-10, at 22.) Abrahamsen also agreed that the fence would help protect skiers from falling off the side. (*Id*.) Transue stated that the purpose of the fence was to hold snow and guide skiers. (Dkt. No. 67-14, at 39.) Halsey agreed that the purpose

46

of the fence was to hold snow, and further stated that "both fences would be for safety." (Dkt. No. 67-11, at 72.) However, Snyder claimed that the fences on the side of the lift were not there for safety, but rather "to hold the snow in place." (Dkt. No. 65-12, at 38.)

The evidence in this case additionally shows a remaining question of fact regarding the "grooming" process of the B-Lift unloading area. As stated above, Defendants repeatedly emphasize that Plaintiff Good "left the groomed surface and proceeded onto the ungroomed surface, taking her off-trail." (Dkt. No. 65-32, at 16-17.) They also argue that Plaintiff found herself in the off-trail position "because of the snow surface conditions on the unloading ramp – conditions that are accepted by participants as a matter of law as set forth in the Safety in Skiing Code." (Dkt. No. 73-16, at 12.) Before addressing the location of Plaintiff Good's accident, a preliminary fact question exists regarding how Hunter employees actually "groom" the snow, which in turn affects where the "ungroomed surface" begins and Defendants' reliance on that fact.[17] Snyder testified at his deposition that the snow in the unloading area is groomed from fence to fence, and Transue testified that one of the causes of a missing board on a snow fence is a groomer "hit[ting] it." (Dkt. No. 67-7, at 47-48; Dkt. No. 67-14, at 85-86.)  McDevitt testified that the groomers cannot get close to the fence because they might hit it. (Dkt. No. 67-10, at 26-27.) Pictures of the B-Lift unloading area show a small area next to the fence that potentially could be ungroomed, which supports Petrozzi's affidavit and McDevitt's testimony that groomers cannot groom the snow all the way up to the fence. (Dkt. No. 65-21, at 10; Dkt. No.

---

[17]    (*See* Dkt. No. 73-16, at 18 [arguing it was not "foreseeable that skiers and snowboarders would end up in the area immediately adjacent to the snow fence with their skis or snowboards facing perpendicular to the fence" because "[t]he area where Plaintiff sat down adjacent to the snow fence was off-trail and ungroomed"].)

65-28, at ¶ 13.) Unlike the other witnesses, who testified in absolutes, Abrahamsen testified that, although he groomed up to the sides of the fence on trails when he was tasked with that responsibility, whether or not the snow was groomed right up against the fence "depend[ed] on the operator." (Dkt. No. 65-10, at 32.)

Most crucially, however, is the dispute of material fact regarding whether Plaintiff Good's accident took place on the unloading ramp, on the trail, or off-trail. When asked to describe the hole Plaintiff Good fell through, Snyder testified that "it was on the side of the trail," and, when immediately asked thereafter if it "wasn't on the side of the unloading ramp," he answered, "Yes. It was on the side of the unloading ramp." (Dkt. No. 67-7, at 48.) McDevitt testified that the accident took place on "a ramp," with the trail starting further down from the ramp. (Dkt. No. 67-10, at 14-15, 22.) Transue testified that the fencing where Plaintiff Good fell through was part of the unloading ramp. (Dkt. No. 65-11, at 51-52; Dkt. No. 67-14, at 82.)

On the other hand, Petrozzi's affidavit states that the "snow fence was off the trail," and, as discussed previously in this Decision and Order, a portion of his deposition testimony supports a finding that the hole in question was off trail. (Dkt. No. 65-28, at ¶ 25; Dkt. No. 67-16, at 178-79.) Halsey, who at one point testified in his deposition that the fence with the broken slat was part of the unloading ramp, went on to testify that "the fence isn't really part of the ramp" and that the rocks were not part of a trail, but rather off trail. (Dkt. No. 65-11, at 51-52, 97-99.) Abrahamsen's deposition testimony about the location of the fence wavered between him stating that it was it "part of the trail" and him not knowing "where the trail is designated a trail." (Dkt. No. 65-10, at 38-39.) As the Court addresses in a subsequent section, Defendants' duties may vary if the accident occurred off-trail—a disputed fact not able to be resolved on summary

48

judgment.

Without resolution of these factual disputes, which the Court may not achieve on summary judgment,[18] the Court has no solid grasp on the basic facts regarding the series of events leading to Plaintiff Good's injuries. These disputes, along with the principle that "the assumption of risk to be implied from participation in a sport with awareness of risk is generally a question of fact for a jury," indicate the impropriety of granting Defendants' motion in this case. *Maddox*, 487 N.E.2d at 557. The Court cannot determine whether Plaintiff Good assumed the risk of the events leading to her injuries, or, alternatively, whether, "due to [Defendants'] negligence, the risks were unique and resulted in a dangerous condition over and above the usual dangers inherent in the activity." *Connor*, 302 A.D.2d at 730. Based on the factfinder's determination of the remaining factual disputes, the factfinder may determine that, like the plaintiffs in Defendants' cited cases,[19] Plaintiff Good assumed the risk of her injuries by

---

[18]     "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255.

[19]     *See Hyland v. State of New York*, 300 A.D.2d 794, 796 (N.Y. App. Div. 3d Dep't 2002) (finding that the "evidence in the record demonstrates that the subject fence was an open and obvious structure which existed on the boundary of a ski trail" and that the court was "satisfied that such a showing sufficiently demonstrated that the fence was a man-made object incidental to the provision and maintenance of Whiteface . . . such that claimant assumed the risk of colliding with it that day"); *Bennett v. Kissing Bridge Corp.*, 17 A.D.3d 990, 990 (N.Y. App. Div. 4th Dep't 2005) (affirming summary judgment to defendants where plaintiff "fell when he skied through slush and 'hit a dry spot' in the middle of the . . . trail; 'slid on the ice' and fell; and slid under a wooden fence to the bottom of a ravine, where he hit a tree and fractured his right leg"); *Reupp v. West Experience*, 272 A.D.2d 673, 674 (N.Y. App. Div. 3d Dep't 2000) ("In our view, plaintiff, who regularly skied, readily acknowledged that skiing is a sport that contains some risk and voluntarily chose to ski at night, assumed the risk of encountering inevitable shadows which might conceal depressions in the terrain."); *Bono v. Hunter Mountain*, 269 A.D.2d 482, 482 (N.Y. App. Div. 2d Dep't 2000) (affirming summary judgment to defendants where the decedent plaintiff, in an attempt to avoid ice in the center portion of the trail, "ski[ed] on a fifteen-foot

participating in the activity of snowboarding. However, the Court is without a sufficient, undisputed factual basis for this legal determination at this stage, and therefore denies Defendants' motion for summary judgment.

### C.   Whether the Court Should Grant Plaintiffs' Partial Motion for Summary Judgment

After carefully considering the matter, the Court answers this question in the negative, for the reasons stated in Defendants' memoranda of law. (Dkt. No. 65-32, 73-16.) To those reasons, the Court adds the following analysis.

As the Court discussed above in Part III.B. of this Decision and Order, multiple questions of material fact remain regarding Plaintiff Good's accident. Like the fact issues plaguing Defendants' motion for summary judgment, these fact issues are fatal to Plaintiffs' motion. Preliminarily, as the Court previously addressed, the question of whether Plaintiff Good assumed the risk of sustaining her injuries by participating in the activity of snowboarding, or, alternatively, whether Defendants' alleged negligence caused unique risks and "resulted in a dangerous condition over and above the usual dangers inherent in the activity," remains for the jury to determine. *Ward*, 284 F. Supp. 3d at 236.

Further, although the multiple factual disputes generally prevent the Court from deciding that either party is entitled to summary judgment, the specific factual dispute regarding whether

---

wide portion along the right tree line, . . . hit an ice patch, fell, struck a tree, and suffered fatal injuries"); *Painter v. Peek N Peak*, 2 A.D.3d 1289, 1290 (N.Y. App. Div. 4th Dep't 2003) (affirming summary judgment to defendants where plaintiff was injured after coming into contact with a "submerged ice divot"); *Bedder v. Windham Mountain Partners, LLC*, 86 A.D.3d 428, 428 (N.Y. App. Div. 1st Dept. 2011) ("Personal injury caused by hitting a stump on the side of the trail, while swerving to avoid another person using the trail, is one of the risks inherent in downhill snowboarding.").

Plaintiff Good's accident, as well as the "snow fence," were located on the unloading ramp, on

the trail, or off trail, must be determined before the Court could decide whether Defendants

violated their statutory and regulatory duties to maintain the fence. For example, Plaintiffs argue

that Defendants violated N.Y. General Obligations Law § 18-103(6), which requires Defendants

"[t]o inspect each open slope or trail that is open to the public within the ski area at least twice a

day and enter the results of such inspection in a log which shall be available for examination by

the commissioner of labor." N.Y. Gen. Oblig. Law § 18-103(6). However, if the jury determines

that the snow fence is located "off-trail," as Defendants insist, the applicability of this statutory

requirement may differ. *Id.* (providing duty to inspect each "open slope or trail"); N.Y. Gen.

Oblig. Law § 18-102(7) (defining "ski slopes and trails" as "areas designated by the ski area

operator for skiing"). This is but one example of why the Court, without resolution of the

disputed material facts regarding Plaintiff Good's accident, cannot determine that Plaintiffs are

entitled to judgment in their favor as a matter of law. The Court therefore denies Plaintiffs'

motion for summary judgment.[20]

      **ACCORDINGLY,** it is

      **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 65) is **<u>DENIED</u>**;

and it is further

      **ORDERED** that Plaintiffs' partial motion for summary judgment (Dkt. No. 67) is

---

[20]      Because the Court does not grant either of the parties' motions for summary judgment due to the multiple remaining factual disputes, at this time, the Court will not address the various evidentiary issues the parties raise in their motions, including, but not limited to, the authenticity and admissibility of the YouTube video and Plaintiffs' computer-generated animation. (Dkt. No. 73-16, at 32-34; Dkt. No. 73-16, at 25-31.) Those issues are more appropriate for pre-trial motions *in limine.*

**<u>DENIED</u>**.

Date:   May 17, 2022
        Syracuse, New York

                                            Glenn T. Suddaby
                                            Chief U.S. District Judge